IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    Plaintiff,        Criminal No. 11-0042-001
               **ELECTRONICALLY FILED**

  v.

HAROLD BACON,

    Defendant.

**MEMORANDUM ORDER ON MOTION FOR COMPASSIONATE RELEASE (ECF 1698) AND MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A), AS AMENDED BY THE FIRST STEP ACT OF 2018 (ECF 1717)**

    Before the Court is Defendant's pro se Motion for Compassionate Release (ECF 1698) and Defendant's counseled motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  ECF 1717.  The Government filed a singular response to both.  ECF 1722.  Thereafter, Defendant's counsel filed a reply.  ECF 1729.  The Parties' submissions included Defendant's medical records and some disciplinary records from the federal correctional institution where Defendant is currently incarcerated.  The Court has carefully reviewed all of these documents, and will DENY the motions for the reasons set forth herein.

    **I. Background**

    Defendant was charged with one count of conspiracy to distribute one kilogram or more of heroin, two counts of possession with intent to distribute 100 grams of a mixture containing a detectable amount of heroin, and one count of unlawful possession of a firearm.  Defendant pled guilty to two of the four charges: (1) the conspiracy charge and (2) the unlawful possession of a firearm charge.  Defendant was 29 years old at the time of his arrest on these charges.

Defendant's Presentence Investigation Report (ECF 1113) explained that during 2010 and 2011, FBI and ATF investigated a street gang known as the Manchester OG's based in Pittsburgh's North Side Manchester neighborhood.  During this investigation, the officers monitored intercepted telephone communications involving Defendant.  These conversations made it clear that Defendant received multiple brick quantities of heroin -- a "brick" is defined as a quantity of 50 stamp bags of heroin -- from two primary sources and then Defendant redistributed those bricks to other heroin dealers.  According to Defendant's Presentence Investigation Report, he was deemed to have played a leadership role within the conspiracy.  As a result, Defendant's total offense level was a 35.

In addition, Defendant's Presentence Investigation Report also noted that Defendant was to be considered a career offender.  Defendant's report indicated that he had previously been convicted of distribution and/or possession with intent to distribute heroin in the Court of Common Pleas of Allegheny County, at CC Nos. 200301639, 200301641, and 200302612.  Because of his prior drug distribution/possession convictions, Defendant in the instant federal case was sentenced with the career offender enhancement which raised his criminal history score from a V to a VI.

At the time of sentencing, Defendant's attorney objected to both the career offender enhancement as well as the enhancement for a leadership role.  The Court prepared tentative findings overruling Defendant's objection to the career offender enhancement noting that Defendant's age (19) at the time he committed the all three of his prior drug offenses did not excuse his conduct.  In addition, the Court further noted that Defendant's pattern of criminal behavior illustrated Defendant's "high propensity for recidivism."   Simply stated, the Court found that Defendant's career offender status did not overrepresent his criminal history,

2

especially when considered in light of Defendant's propensity to re-offend. Because the Court

concluded that Defendant was a career offender, the matter of whether he held a leadership role

was essentially moot.

Statutorily, Defendant was facing a mandatory minimum of 10 years on the conspiracy

charge, and a mandatory minimum of 5 years on the firearm charge – to be served consecutively.

Thus, Defendant was facing a 15-year mandatory minimum on the charges to which he pled

guilty.

Defendant was sentenced to serve 240 months imprisonment on the conspiracy charge –

in compliance with the statutory mandatory minimum requirement. Defendant was also

sentenced to serve 60 months, consecutively, on the firearms charge – again in compliance with

the statutory mandatory minimum requirement. Defendant's total imprisonment sentence of 300

months was below the then-guideline range of 352 to 425 months imprisonment. ECF 1204.

The Court explained its sentence by noting that Defendant had exhibited a pattern of

possessing and dealing drugs and had been undeterred by the previous State court sentence of

imprisonment and the pending charges that he faced on many of these offenses. Indeed,

Defendant committed some of the crimes while he was on bond pending additional charges. As a

result, the Defendant appeared to the Court to have a high likelihood to return to drug dealing if

he were sentenced to a shorter period of incarceration in this Federal case. In addition, at the

sentencing hearing, the Court stated:

> Since my sentence is below the guideline range, I have the following
> additional comments. The Court has found that a sentence within the
> applicable advisory guideline range of 352 to 425 months imprisonment to
> be greater than necessary to achieve the goals of sentencing. There
> certainly is no dispute that the Defendant's criminal conduct was very
> serious, and he was personally involved with a large amount of drugs.
> However, the Court does not find that this Defendant's behavior is so
> severe as to justify the almost 30 years imprisonment, which would be

significantly more than other co-Defendants in this case. The sentence imposed is less than the applicable advisory guideline range, but still is a very lengthy sentence to serve as a purpose of deterring others from similar conduct, to protect the public from crimes by this particular Defendant, and to provide for just punishment.

If the Defendant was sentenced at the low end of the guideline range, he would be in his late fifties or early sixties once he's released. Although the Defendant was classified as a career offender, he has not served a significant period of time of incarceration for his crimes. Therefore, a thirty-year sentence may be too lengthy for this Defendant to serve his first substantial period of incarceration.

The Court is tasked with determining a sentence that is sufficient but no greater than necessary to comply with the sentencing goals. In this case the Court believes that such a sentence is below the applicable advisory guideline range, and is consistent with similar defendants who have been convicted of similar offenses and with co-Defendants in this case and a similar case at 11-00045. So, the Defendant's motion for downward departure and/or variance contained in the sentencing memorandum at Document No. 11-52 is granted in part and denied in part. I also believe further that this sentence is consistent with the other sentences that have been entered in the 11-45 and the 11-42 cases.

Obviously, it's very difficult comparing folks with individual characteristics with different stipulated amounts of drugs, criminal history being different and guideline ranges, but I've strived to in this sentence, which is a variance, to have a sentence which is consistent with other sentences and believe that a sentence within the guideline range would have led to an unwarranted sentencing disparity among Defendants with similar records who have been found guilty of similar conduct.

ECF 1224.

Defendant appealed his sentence and after the appeal was terminated, Defendant filed a Section 2255 Motion, which was also denied. Now, Defendant files the instant Motion for Compassionate Release and his attorney also filed a First Step Motion for Reduction of Sentence. ECF 1698 and ECF 1717.

**II. Standard of Review**

The First Step Act's amendment of 18 U.S.C. § 3582 ("Section 3582") provides in relevant part:

> The court may not modify a term of imprisonment once it has been imposed except that—
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The defendant bears the burden of proof, by a preponderance of the evidence, with respect to a motion for compassionate release brought pursuant to Section 3582(c)(1)(A)(i). *U.S. v. Grasha*, Crim. No. 18-325, 2020 WL 5747829, at *2 (W.D. Pa. Sept. 24, 2020) (citations omitted).

**III. Discussion**

As noted above, Defendant must prove by a preponderance of the evidence that he is entitled to a compassionate release from his term of imprisonment.[1]  Defendant's primarily claims that this Court should grant his request for compassionate release from his term of

---

[1] Defendant has fully complied with the required administrative process seeking compassionate release, and therefore, he has standing to now bring this issue before the Court.  See ECF 1717-2 and ECF 1717-3.

imprisonment because his individual circumstances – meaning his CDC-recognized, COVID 19 comorbidities (asthma, history of smoking, and his racial predisposition), combined with the danger of reinfection (Defendant tested positive for Covid in October of 2020), and the alleged lack of ability of  FCI -Pekin (the institution where Defendant is imprisoned) to manage the virus – warrant such relief.   Defendant also contends that under 18 U.S.C. § 3553 there are several mitigating factors this Court should consider in conjunction with his health conditions, the COVID 19 pandemic and the prison's alleged inability to adequately protect him, namely: (1) he acknowledged his guilt and has exhibited remorse and shame; (2) he has a viable release plan; (3) he has obtained his GED while imprisoned; (4) he has maintained a strong bong with supportive family members during his incarceration; and (5) other courts have granted compassionate release to defendants as dangerous or more dangerous than Defendant.[2]

The Government's response to Defendant's arguments explain that Defendant's individual medical conditions relative to COVID-19 can be readily addressed at FCI-Perkin, and note that this Court and other Courts have recognized the fact that second infections are unlikely, and therefore support a denial of Defendant's request for release.  In response to the mitigating factors Defendant posited, the Government contends that Defendant's criminal history is such that Defendant has proven by his past conduct that he is a true danger to the community and should not be released.

### A. Extraordinary and Compelling Reasons

This Court begins its own analysis by first noting that Defendant, with his asthma condition, smoking history, and ethnicity has already contracted and survived COVID-19 while incarcerated at Perkin-FCI.  Defendant's medical records show that his test result was returned

---

[2] Defendant's counsel provided the Court with a six-page non-exhaustive list of United States District Court decisions granting compassionate release to inmates who have previously tested positive for COVID-19.  ECF 1717-1.

positive for COVID-19 on October 19, 2020, but the record also notes that Defendant was

asymptomatic.  ECF 1721 at p. 11.  The Court concludes that despite Defendant meeting one or

more of the CDC high risk categories for COVID-19, Defendant's bout of COVID-19 was,

fortunately, rather mild.

      As for reinfection, the CDC website indicates the following:

> To date, reports of reinfection have been infrequent.  Similar to other human coronaviruses where studies have demonstrated reinfection, the probability of SARS-CoV-2 reinfection is expected to increase with time after recovery from initial infection because of waning immunity and the possibility of exposure to virus variants.
>
>               *        *        *
>
> An increasing number of published studies suggest that >90% of recovered COVID-19 patients develop anti-SARS-CoV-2 antibodies.  Additional studies also demonstrate antibody response, including neutralizing antibodies and antibody response following mild or asymptomatic infection, can be durable for 6 months or more.  This evidence must be interpreted cautiously, as anti-SARS-CoV-2 antibodies have not been definitively correlated with protection from SARS-CoV-2 infection, and it is unclear what antibody titer would be associated with protection.
>
> Some studies have also noted lower titers and faster waning of anti-SARS-CoV-2 antibodies in mild or asymptomatic cases of COVID-19.
>
> It is important to note that antibodies are only one component of human immunity and that immunity may be achieved through other mechanisms such as virus-specific memory T and B cells.  Studies suggest that the memory T and B cell response can be durable for 6 months or more.  However, one study found that T cell responses were 50% higher among symptomatic adults compared with asymptomatic adults at 6 months post-infection.

https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited March 19,

2020).  Based upon what is presently know and set forth on the CDC website, the Court notes

that Defendant's presumably mild case of COVID-19 provided him with antibodies to assist him

in fending off a second infection – at least for a period of time.  It is undisputed that Pekin-FCI

has started to immunize its inmates and staff.  Defendant's counsel notes that this is not

happening a rate that is amenable to his client.  However, in light of the fact that in the Western

District of Pennsylvania (and elsewhere throughout the United States) only certain members of

society are presently eligible for immunization, and immunization shots in some locations are not

readily available, and when they are available, any open slots are quickly filled, it is not a

guarantee that Defendant would have an easier time becoming immunized if he were released.

Thus, Defendant's arguments with respect to his medical conditions while valid, fall

somewhat flat in light of the fact that the immunization situation at FCI-Pekin.  As of today,

there are 8 active COVID-19 cases at Pekin-FCI (all 8 infected are staff members).

https://www.bop.gov/coronavirus/ (last visited March 19, 2020).  According to Defendant's

counsel, 80% of the inmates have previously tested positive for COVID-19.  In addition, 89 of

the inmates at FCI-Pekin and 92 staff members there have also been immunized.  ECF 1729, p.

12.  Thus, there are inmates and staff members who are, at a minimum, temporarily immune

from the virus because of their prior bouts of COVID-19 providing them with antibodies, and an

immunization program is underway at the prison facility itself.

That said, the Court finds merit in Defendant's other argument that FCI-Pekin's "living

conditions" make it challenging to stop the spread of COVID-19.  However, all communal living

facilities – nursing homes, group homes, homeless shelters, and similar facilities – all face

challenging conditions in light of COVID -19.  The Bureau of Prisons has established protocols

and procedures to minimize the risks at their facilities, and in the face of real risks, the prisons

lock down units to prevent spread.

### 2. Section 3553 Factors

However, as noted above, this Court must also consider the Section 3553(a) factors as well. To that end, this Court notes that it sentenced Defendant to 300 months (a sentence which was below the then-guideline range of 352 to 425 months imprisonment), and Defendant faced a 15-year (180-month) mandatory minimum sentence. Defendant's mandatory minimum sentence arose not only because of the instant conspiracy and gun crimes to which he pled guilty in this case, but also as a result of his of his multiple prior drug trafficking and gun violations. All of his offenses were committed before Defendant turned age 30.

To date, Defendant has served 119 months of his 300-month sentence. The number of months he has served falls woefully short of the 180-month mandatory minimum and does not come close to comprising half of his actual 300-month sentence.

Defendant bore the burden of proving to this Court that he is in fact ready to return to society early – very early, in this case – and that none of the Section 3553(a) factors should act as a bar to his re-entry at this time. Therefore, in support of his position, Defendant argued that: (1) he completed his GED while in prison, that he has a solid home plan (he would live his mother in McKees Rocks under home confinement upon his release) with strict ground rules about visitors, (2) he has strong family support from his immediate and extended family who have continued to visit with him since his incarceration, and (3) he can obtain any medical care necessary from Ohio Valley Hospital through medical assistance until he becomes employed.

The Government counters by noting that when Defendant conspired to distribute at least 100 grams of heroin and possessed a firearm in the instant federal case, he did so after he had already been convicted in "three separate state criminal cases for heroin trafficking and had served a 2 to 4 year state prison sentence." ECF 1722 p. 8. The Government also commented

on the fact that Defendant was an active member of a street gang and that he tried to shield himself from prosecution by using young runners to store and deliver heroin for him, as well as a female associate who picked up and transported hundreds of bricks of heroin from Pittsburgh to Maryland and New Jersey.  Id., p. 9.

This Court, during Defendant's sentencing hearing, provided the following rationale for Defendant's sentence of 300 months:

> First, the nature and circumstances of the offense. The Defendant's charges in this case are the result of an investigation by the ATF and FBI into the Manchester OG's, a violent street gang based in the Pittsburgh North Side. The Defendant was an admitted member of the Manchester OG's. The investigation included monitoring cell phone communications between members of the conspiracy. The intercepted communication and surveillance techniques revealed that this Defendant distributed multiple bricks of heroin to several associates on a regular basis, often on a daily basis.  On several occasions the Defendant distributed 30 bricks or more at a time. The Defendant would be supplied by heroin in brick and unbagged form by local suppliers, and he would meet with an out-of-town -- out-of-state supplier in Hagerstown, Maryland.  The Defendant used an associate to store the bricks of heroin for him and to distribute some of those bricks to customers. The Defendant would then sell his bricks to lower level drug dealers and other drug users. Occasionally, Defendant would sell the bricks on credit.
>
> In June of 2010, the Defendant distributed heroin in exchange for a .40 caliber Desert Eagle pistol. He later exchanged the pistol with another male. Stolen firearms sold on the black market in this manner put people in the community at great risk. These weapons are often used to intimidate others and prevent them from involving the police when they know criminal activity that is occurring, and the weapons are used in violent home invasions between drug dealers.
>
> The Defendant's buying and selling of firearms while dealing drugs is extremely serious criminal conduct and a great danger to the community.
>
> The Defendant not only would be involved in large scale drug deals, but he also was involved with buying and selling drugs on almost a daily basis. Parties have stipulated that the Defendant is responsible for between 700 grams and one kilogram of heroin. Again, this is a large amount of a dangerous drug. And this drug dealing by the Defendant and the others in this conspiracy has led to generational addiction, fear, crime, violence and death in their community.

Young men like the Defendant and women ignore educational and employment opportunities, but instead choose because of the temptation of quick and easy money to deal with drugs over an extensive period of time, as occurred with the Defendant, often involving younger men and women into the conspiracy net.  Instead of seeking out educational and vocational training, they are exposed to gun violence, jail time and the stigma of being a convicted felon.

The Defendant's conduct contributed substantially to this community, especially in his position, to be overrun with drugs and crime. His actions over an extensive period of time were indeed a serious crime mandating this very serious period of incarceration.

I've also considered the Defendant's family, criminal and social history. I appreciate the family members who spoke today on his behalf and the struggles they've had with him throughout the years.

The Defendant is approximately 30 years old. His criminal history began when he was only 14 years old. He was adjudicated delinquent twice as a juvenile, once for these charges related to identity theft and again when he was 15 years old relating to stealing a car.

He's had numerous adult convictions for drug dealing offenses, including three prior felony drug convictions, and as a result he's classified as a career offender.

He's also pled guilty to carrying a firearm without a license, multiple counts of possession of a controlled substance and six counts of disorderly conduct. The details of Defendant's many disorderly conduct charges include that Defendant was found in possession of drugs.

The longest sentence the Defendant has received as a result of these convictions is two to four years imprisonment. Unfortunately, this imprisonment did not help him change his conduct. The Defendant has exhibited a pattern of possessing and dealing drugs and has been undeterred by the previous State court sentence of imprisonment and the pending charges that he faced on many of these offenses. Indeed, Defendant committed some of the crimes while he was on bond pending additional charges.

ECF 1224, p. 28-31.

This Court went on to note at the sentencing hearing that Defendant appeared to have a strong bond with his mother and sister in particular, encouraged him to become a positive role model for his seven children, and thanked the extended family members who spoke on Defendant's behalf.   However, the Court ultimately concluded and explained during the hearing, that a short period of incarceration would be ineffective because Defendant had already been

incarcerated for a short period of time to no avail.  This fact supported the Court's belief that Defendant possessed a strong likelihood of reoffending given that his record illustrated a propensity to continue to commit crimes while still serving penalties for other past crimes.  The Court also explained its careful consideration of the fact that the guideline range seemed to overstate Defendant's criminal status because did not account for his strong family support, his difficult background, and his young age.  It was for all of these reasons that this Court set Defendant's sentence at a total of 300 months imprisonment, with certain special conditions upon his release from the Bureau of Prisons during his term of supervised release – all of which the Court assigned to assist Defendant in becoming a productive member of society.

While incarcerated, it appears to this Court that Defendant has started to take some small steps toward the ultimate goal of becoming a productive member of society.  He has obtained his GED.  He has worked to maintain positive relationships with those who will support him upon his release.  He has suffered a few setbacks as his disciplinary record shows, but those infractions may not be of his own making.  He also has not agreed to perform any work while incarcerated.  The Court is pleased to see that overall, Defendant is moving toward a positive direction and encourages him to continue to strive for a goal that is most certainly within his reach.

That said, there is simply no evidence that Defendant has presented relative the 3553 factors that would cause this Court to alter its sentencing decision and release Defendant in the near or immediate future.  To the contrary, most, if not all of the factors that Defendant raises in his motion(s) were present at the time of sentencing.  He had the same strong family support around him during the years he pursued a life of trafficking drugs and firearms.  His GED may be new, but it is no guarantee that he will use his education to gain lawful employment if he is released immediately.  The fact that he has declined to take work assignments while in prison

12

and he has had no gainful, legal employment since his teenage years is disappointing.   His lack of motivation toward work does not give the Court confidence that Defendant is indeed ready to re-enter society as a productive member.

As a result, this Court finds after considering the all of the factors set forth in section 3553(a), Defendant's unique medical conditions, the living situation at the Pekin-FCI, and the potential for reinfection, Defendant has failed to meet the burden of proving extraordinary and compelling reasons to warrant a reduction in Defendant's sentence.  For these reasons, Defendant's motion (ECF 1698) as well as his counseled motion (ECF 1717) are DENIED.

SO ORDERED this 19th day of March, 2021.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All ECF Registered Counsel of Record